**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00207-001 (CRC)** |
| **v.** | : | |
| | : | |
| **BRADLEY JAMES BOKOSKI,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Bradley James Bokoski to 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

I.      **Introduction**

Defendant Bradley James Bokoski participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]  Bradley Bokoski's son and co-defendant, Matthew Bokoski, also participated in the attack on the U.S. Capitol.

---

[1] Although the Statement of Offense in this matter, filed on October 13, 2022 (ECF No. 31 at ¶ 6) reflects a sum of more than $2.7 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Bradley Bokoski pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  As explained herein, a short sentence of incarceration is appropriate in this case because he: (1) entered the Capitol through the Senate Parliamentarian Door approximately five minutes after the door was breached and before many other rioters, (2) claimed in a consensual interview with the FBI that a police officer standing near the Senate Parliamentarian Door through which Bradley entered the Capitol invited the rioters into the Capitol, a claim reiterated by his codefendant, Matthew Bokoski, in clear contrast to the evidence indicating no such conversation occurred; and (3) he asked Matthew Bokoski to delete some of the material his son posted to his Facebook account from January 6, 2021.

The Court must also consider that Bradley Bokoski's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Bokoski's crime support a sentence of 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution in this case.

## II.   <u>Factual And Procedural Background</u>

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 31 (Statement of Offense), at 1-7.

*Defendant Bradley Bokoski's Role in the January 6, 2021, Attack on the Capitol*

On January 5, 2021, Bradley Bokoski travelled to Washington, D.C. from Reno, Nevada, to attend the "Stop the Steal" rally.  Co-defendant Matthew Bokoski traveled to Washington, D.C.

from Chicago, Illinois, on January 5, 2021, and met Bradley Bokoski in D.C..[2]   Bradley invited Matthew on the trip.

On the morning of January 6, Bradley Bokoski and Matthew Bokoski went to the National Mall and attended the rally where they joined a large crowd who, like the Bokoskis, believed that the 2020 election had been stolen.  Bradley Bokoski and Matthew Bokoski were separated during the rally, but the two men reconnected after the former president's speech.  Afterward, the Bokoskis walked with a large crowd along Constitution Avenue towards the U.S. Capitol Building.

Matthew Bokoski and Bradley Bokoski approached the U.S. Capitol from the west.  At 2:36 p.m., the body worn camera of a Metropolitan Police Department Officer who was present near the northwest lawn during the afternoon of January 6, 2021, captured an image of Bradley Bokoski.

Using his mobile phone, Matthew Bokoski took photos on January 6, 2021, including those that appear to have been taken from inside the restricted area.  Those photos show police barriers and the West Front Inaugural Platform, as well as rioters climbing the scaffolding and the West Terrace walls and approaching the police lines.  *See* Figures 1, 2, and 3.

---

[2] Like Bradley Bokoski, Matthew Bokoski has also pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). Matthew Bokoski will be sentenced on the same date as Bradley Bokoski. The government has filed a separate sentencing memorandum in Matthew Bokoski's case.



*Figure 1*

*Figure 2*



*Figure 3*

The Bokoskis were part of a large crowd of rioters on the Northwest Terrace of the U.S.

Capitol.  Matthew Bradley took a photo (Figure 4, below) of the large crowd of rioters gathered

on this Terrace and entering the Senate Parliamentarian Door.  A red arrow has been added to this

photo which shows the location of the Senate Parliamentarian Door.  No police officers appear in this photograph by the Senate Parliamentarian Door.



*Figure 4*

Matthew Bokoski also took at least two videos showing the large crowd of rioters on the Northwest Terrace of the U.S. Capitol.  In the first video, Exhibit 1, the crowd is chanting "Stop the Steal."  (Ex. 1, Matthew Video Terrace 1).  In the second video, Bradley Bokoski is shown as the men approach the Senate Parliamentarian Door.  (Ex. 2, Matthew Video Terrace 2, Video at time 0:00 – 0:02).  No police officers appear in those videos near the Senate Parliamentarian Door as the Bokoskis approach the Door.  (Ex. 2, Video at time 00:17 – 00:19).

The Bokoskis entered the U.S. Capitol through the Senate Parliamentarian Door at approximately 2:47 p.m., approximately 6 minutes after the initial breach of the Senate

Parliamentarian Door by other rioters.  United States Capitol Police closed circuit video ("CCV") shows details of the interior of the U.S. Capitol at this location.  (Ex. 3, Ex. 4).

Rioters broke the two glass windows in the Senate Parliamentarian Door, located just outside the Senate Parliamentarian office at approximately 2:42 p.m.  The Senate Parliamentarian Door is a fire exit door, not a public entrance door.  There is no screening equipment for the public at the Senate Parliamentarian Door.  A few seconds after the glass windows were broken, a rioter reached in through the window and pushed the emergency door bar, opening the Senate Parliamentarian Door from the outside.  The first rioters fought with Capitol police at the Senate Parliamentarian Door, but then pushed their way into the corridor.  Large numbers of rioters began entering from the outside through the Senate Parliamentarian Door.  No police were then near the Senate Parliamentarian Door because they had been pushed back into the corridor of the Capitol by the rioters.

Some of the rioters forced open the interior door to the office of the Senate Parliamentarian.  Then, a rioter attempted to ram open another door across the corridor from the Senate Parliamentarian's office, using a Capitol sign.  Additional rioters pounded on that door over the next ninety seconds, first using the Capitol sign, then multiple rioters pushing against the door, eventually breaching that office door.  Rioters continued to stream in through the Senate Parliamentarian Door.  Over the next minute, at least three rioters were at the Senate Parliamentarian Door, waving people in from outside and encouraging their entry into the Capitol.

According to Capitol police video, Bradley Bokoski was yelling as he entered the Capitol at the Senate Parliamentarian Door.  (Ex. 3, CCV at video time 00:04).  After crossing into the Capitol, Bradley Bokoski and Matthew Bokoski were holding cell phones and appeared to be recording video or taking photographs of their entry into the Capitol Building.  (Ex. 3, CCV at

video time 00:10 – 00:15; Ex. 4, CCV at video time 00:01 – 00:05). As shown in Figures 5 and 6, below, Defendant Bradley Bokoski (circled in white) is accompanied by Matthew Bokoski (circled in red).  Bradley Bokoski (circled in white) is accompanied by Matthew Bokoski (circled in red). Matthew Bokoski was wearing a blue and red knit cap with a pom pom and red and blue "TRUMP 2020" flag on his back.  Bradley Bokoski is wearing a gray jacket and eyeglasses and has a white mustache and beard.



*Figure 5*



*Figure 6*

When he entered the U.S. Capitol, Bradley Bokoski appeared to have a short conversation with a rioter in a black jacket, camouflage pants and a backpack near the Senate Parliamentarian Door.  (Ex. 3, CCV at video time 00:11 – 00:14; Ex. 4, CCV at video time 00:00 – 00:02).  The rioter with the black jacket, camouflage pants and a backpack came from the office door across from the Senate Parliamentarian office door and moved to the Senate Parliamentarian Door.  (Ex. 3, CCV at video time 00:1 – 00:09).

The Bokoskis did not enter the office of the Senate Parliamentarian but continued a short distance down the corridor.  Matthew Bokoski continued to film the corridor scene on his phone as the Bokoskis walk down the corridor.  (Ex. 3, CCV at video time starting 00:19; Ex. 4, CCV at video time 00:02 – 00:12).

7

FBI Agents obtained a copy of a video taken by Matthew Bokoski from inside the U.S. Capitol and posted on his Facebook account at 4:40 p.m. on January 6. (Exhibit 5). In this video, Bradley Bokoski is shown as the men stand in the corridor and the rioters are chanting "USA" over and over. (Ex. 5, Corridor Video at video time 00:53 – 00:56). An alarm is clearly heard during the entirety of this video. Further, audio captures a rioter in the proximity of the Bokoskis yelling threats against Speaker Nancy Pelosi, including "We're coming for you Nancy. We're coming for you. . ." (Ex. 5, Corridor Video at video time 00:12 – 0:21). A single officer stands guard on the staircase, in the middle of the chaos in the corridor. (Ex. 5, Corridor Video at video time 0:32 – 0:34). The following image, Figure 7, taken within the U.S. Capitol building, was saved from that video.



*Figure 7*

Bradley Bokoski and Matthew Bokoski moved with the crowd down the corridor where they met a police line of approximately ten to fifteen officers. (Ex. 4, CCV 00:10 – 00:20). Back near the Senate Parliamentarian Door, additional police officers entered the corridor from the

office across the corridor from the Senate Parliamentarian's office.  The police officers began to move the rioters towards the Senate Parliamentarian Door and out of the Capitol.

Bradley Bokoski and Matthew Bokoski turned around and walked back towards the Senate Parliamentarian Door.  They walked past the police officers in the corridor. Bradley Bokoski appeared to have a brief conversation with the police officers in the corridor.  One of the officers shook his head in a "no" gesture, then Bradley Bokoski and Matthew Bokoski exited the Senate Parliamentarian Door.  The Bokoskis exited the Senate Parliamentarian Door at approximately 2:52 p.m., and they were in the Capitol building for approximately 4-5 minutes.

*Bradley Bokoski's Interview with Law Enforcement*

On June 21, 2021, law enforcement officers conducted a voluntary interview with Bradley Bokoski.  In this interview, which was conducted via telephone, Bradley Bokoski told officers that he had attended several Trump rallies in Illinois and Nevada prior to January 6, 2021.  A couple of weeks before January 6, 2021, Trump announced a rally in Washington, D.C., and Bradley Bokoski contacted his son and they decided to make the trip to Washington, D.C.

Bradley Bokoski told officers that on January 6, 2021, he entered the Capitol building with his son, Matthew Bokoski.  Bradley Bokoski told officers a Capitol Police Officer was standing near the door and said, "Welcome to the People's House, please do not touch anything."  They proceeded to walk inside the Capitol, where they observed people breaking glass.  Shortly thereafter, Bradley Bokoski asked a Police Officer if there was a restroom he could use and he was told "no".  He and Matthew Bokoski immediately left the building.

Bradley Bokoski acknowledged that he and Matthew Bokoski had photos of their activities and Matthew had posted photos to Facebook.  Bradley Bokoski told agents that he asked Matthew to remove the photos from the trip from Facebook due to the negative comments, but his son likely

still had the photos on Facebook.  Bradley Bokoski did not have Facebook or Twitter accounts at the time.  Bradley Bokoski was very cooperative with law enforcement during the interview.

*The Charges and Plea Agreement*

On May 16, 2022, the United States charged Bradley Bokoski and Matthew Bokoski by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G).   On May 25, 2022, law enforcement officers arrested Bradley Bokoski in Eagle Mountain, Utah.   On June 6, 2022, the United States charged Bradley Bokoski and Matthew Bokoski by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1), (a)(2); and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G).  On October 13, 2022, pursuant to a plea agreement, Bradley Bokoski pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  By plea agreement, Bradley Bokoski agreed to pay $500 in restitution to the Department of the Treasury.

## III.    **Statutory Penalties**

Bradley Bokoski now faces a sentencing on a single count of violating 40 U.S.C. § 5104 (e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    **Sentencing Factors Under 18 U.S.C. § 3553(A)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Bokoski's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Bokoski, the absence of violent or destructive acts is not a mitigating factor. Had Bokoski engaged in such conduct, he or she would have faced additional criminal charges.

One of the most important factors in Bradley Bokoski's case is that he made statements to FBI agents that are not credible in light of the video evidence.  He told agents that a police officer "welcomed" him and his son into the Capitol, but this is not reflected in the Capitol police video showing the Bokoskis entering the Capitol.  Further, Bradley Bokoski entered the Capitol Building through the Senate Parliamentarian Door approximately five minutes after this door was breached by rioters.  This was a fire exit door, not a public entryway.  Other rioters broke the glass windows and forced the door open, which set off loud alarms in the corridor.  Bradley Bokoski saw and continued towards the Capitol despite the chaos created by the mob, from people scaling the

scaffolding and terrace walls, and the swell of rioters in the Northwest Terrace. Even though Bradley Bokoski cooperated with FBI agents when they contacted him, he minimized his conduct in his statement to the FBI agents.

Accordingly, the nature and the circumstances of this offense establish the need for a short sentence of incarceration in this matter.

### B.  The History and Characteristics of Bokoski

As set forth in the draft PSR, Bradley Bokoski's criminal history is minimal with only a 2004 fine related to a violation of native landscape. The draft PSR indicates Bradley Bokoski had not returned signed consent forms for probation to corroborate certain information in the report.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Bradley Bokoski made a statement to law enforcement that is contrary to video evidence. In his voluntary interview with law enforcement, Bradley Bokoski stated that a police officer welcomed his entry to the Capitol.  While the Senate Parliamentarian Door was open when the Bokoskis walked through it, it was noticeable that the windows to the door had been broken in, that the door was not a public entrance but a fire exit door, that the alarms were going off and that the officers at the end of the hall were preventing their further progress deeper into the Capitol. Bradley Bokoski's statement that a law enforcement officer said "Welcome to the People's House, please do not touch anything" is contrary to the Capitol police video evidence in this case.  Finally, Bradley Bokoski's direction to his son to take down the photos from the Capitol the day after the riot that were on Matthew's Facebook account shows that Bradley was aware that being in the Capitol was wrong.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Bokoski based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

---

[3] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section

3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense

16

is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this court has sentenced Capitol breach defendants who had similar factors to Defendant Bokoski:

In *United States v. Robert Bauer*, 21-cr-49, the defendant pled to the misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing inside the Capitol) in connection with his actions on January 6.  Although that defendant admonished other rioters not to assault law enforcement officers, he treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised.  The defendant was inside the Capitol for a brief period of time – approximately 17 minutes – yet made his way into the Crypt, where police officers were being attacked.  The defendant admitted to his actions only two days after the riot and accepted

responsibility early through a plea agreement, but had not expressed true remorse for his actions, stating to the FBI, "I don't feel like I done nothing terribly wrong."  The defendant did have a serious criminal history.  Judge Chutkin sentenced the defendant to 45 days incarceration, 60 hours community service and $500 restitution.

Several other defendants have received sentences of probation and fines for their brief entry into the Capitol from this Court.  In *United States v. John Wilkerson IV*, 21-cr-302 (CRC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building at the Senate wing door, remaining in the Capitol building for 20-25 minutes, and making minor post 1/6 statements indicating a lack of remorse.  Judge Cooper sentenced the defendant to 36 months' probation, a $2,500 fine, 60 community service and $500 restitution.  In *United States v. Julia Sizer*, 21-cr-621 (CRC), the defendant pled guilty to the misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) in connection with being inside the Capitol for only 2 minutes; but defendant first lied to law enforcement about going in, then corrected that lie; the defendant had no social media statements or criminal history; but intended to stop certification.  This court sentenced the defendant to 12 months' probation, a $2,000 fine, and $500 restitution.  Unlike these defendants, Bradley Bokoski made statements to agents that a police officer welcomed him into the Capitol, contrary to video evidence.

In *United States v. Jacob Lewis*, 21-cr-1000, the defendant pled guilty to 40 U.S.C. § 5104(e)(2)(G) in connection with his planned trip to Washington, D.C. and the Capitol, and he entered knowing the Capitol building had been breached.  In his interview, he expressed no remorse for his actions and lied to law enforcement about being "escorted in" to the Capitol.  The defendant was inside the Capitol for about 7 minutes, and he did not engage or encourage violence

or property destruction.  This court sentenced the defendant to 24 months' probation, a $3,000 fine, $500 restitution, and 60 hours community service.  Unlike this defendant, Bradley Bokoski told his son to delete his Facebook posts from January 6 events in the Capitol.

Here, Bradley Bokoski entered the Capitol with obvious evidence that entering the Capitol was illegal – he passed through the West Terrace having seen people climbing a scaffolding and terrace walls, he entered the Senate Parliamentarian door only five minutes after the door was breached, the windows to the Senate Parliamentarian Door were broken and the fire exit alarm was sounding loudly in the corridor, and even though he stayed in the corridor a few minutes, he stayed after another rioter was yelling threats against Speaker Pelosi.  While he ultimately accepted responsibility for his actions and pled early, Bradley Bokoski made a statement to FBI agents that is contrary to the video evidence in this case.  The video evidence from Capitol police and Matthew Bokoski directly contradicts Bradley Bokoski's statement to law enforcement that when he entered the Capitol, a Capitol police officer told him "Welcome to the People's House, please do not touch anything."

## V.  A Sentence Of Probation May Include Imprisonment As A Condition Of Probation.

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[4]

## VI.   A Sentence Imposed For A Petty Offense May Include Both Imprisonment And Probation.

The government's recommended sentence 14 days imprisonment and 36 months or probation is also permissible under 18 U.S.C. § 3561(a)(3).  As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses." *Little*, 590 F.Supp.3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).  Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[5]

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Bradley Bokoski to 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[4] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

[5] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    s/ Lynnett M. Wagner
Assistant United States Attorney
Nebraska Bar No. 21606
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street NW
Washington, DC 20530
402-661-3700
lynnett.m.wagner@usdoj.gov

## CERTIFICATE OF SERVICE

On this 10th day of January 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/Lynnett M. Wagner
LYNNETT M. WAGNER
Assistant United States Attorney